STATE, Plaintiff-Appellee, v. BALDRIDGE, Defendant-Appellant.

Ohio Appeals, Second District, Fayette County.

No. 287. Decided November 17, 1956.

**550**

John S. Bath, Pros. Atty., Washington C. H., Ray W. Davis, Circleville, for plaintiff-appellee.

E. S. Young, West Union, W. S. Paxson, Washington C. H., Emory F. Smith, Ernest G. Littleton, Portsmouth, for defendant-appellant.

## OPINION

By MILLER, PJ.

This is a law appeal from a judgment of the Common Pleas Court rendered upon the verdict of a jury finding the defendant-appellant guilty of manslaughter in the first degree.

For the purpose of testing the errors assigned we shall relate the evidence most favorable to the State which reveals that on November 15, 1955, the hunting season for certain wild game was opened in this state; that on said date Irwin J. Patrick and Jack Kamman were acting as game protectors and conducting a game survey in Fayette County; that as such officers they drove onto the farm of the defendant in their automobile. Several parties were there engaged in hunting pheasants and rabbits. The officers approached one of the parties of which the defendant was a member, and after conducting a search found that one Donald Butler had two hen pheasants in his possession, which was in violation of state law. He was arrested by said officers for this alleged violation. His gun and birds were taken from him and he was then placed under arrest and put in the rear seat of the officers' car. The defendant objected to the arrest, said that Butler was his guest and that he could kill anything on his own farm. Officer Kamman testified that the defendant became so irate that Officer Patrick threatened to arrest him for interfering if he persisted in trying to divert him in the performance of his duties. The officers then proceeded in their car to where there was another hunting party on the same farm and after making an investigation found no further violations and proceeded to make their exit from the farm by driving down a long narrow lane. While so proceeding the defendant commanded them to stop by putting up his hand and standing in front of their car. In reference to the events which then followed, Officer Kamman testified, continuing:

"He walked in front of the car and put the end of his gun on the door and pointed it in at us.

"Q. What did he say?

"A. He stated again that Mr. Butler was his guest.

"Q. Were you able to see Mr. Baldridge from where you were sitting?

"A. Yes, I could see him.

"Q. How was he holding the gun?

"A. He had command of the gun. He had it like you would ordinarily hold a gun.

"Q. How far was this muzzle?

"A. End of the barrel was right on the edge of the window.

"Q. Now, what then happened?

"A. Mr. Patrick, he said 'Let's talk this over, George,' and opened the door and got out.

"Q. What kind of a car was that?

"A. Two door Chevrolet.

"Q. What next happened?

"A. Mr. Patrick got out, Mr. Baldridge moved toward the open side of the car and the next thing I saw Mr. Baldridge holding his gun high over his right shoulder.

"Q. Which way was it pointed?

"A. Behind.

"Q. Can you describe to the jury what happened?

"As I saw Mr. Baldridge he had the shot gun and he was reaching for the gun. Mr. Patrick was reaching.

"Q. What next happened?

"A. The next thing Mr. Baldridge was swinging it.

"Q. Then what happened?

"A. The shot followed.

"Q. Now, Mr. Kamman what next did you hear or see?

"A. Mr. Patrick, he immediately fell on the ground, and he called for me. He said 'Oh, my God, Jack, take me to the hospital' or words to that effect.

"Q. What then happened?

"A. Immediately after I started to get out when Mr. Baldridge shouted to me 'To leave him alone.'

"Q. What were the words?

"A. 'Leave him alone.'

"Q. What did you do?

"A. I left him alone.

"Q. Did you notice Mr. Baldridge?

"A. All I saw was the shot gun.

"Q. Now where was Mr. Baldridge standing at that time with relation to the car?

"A. I would say 15 feet behind the car. In the grassy strip.

"Q. Is the grassy strip between the line fence and the lane?

"A. It was.

"Q. Where was Mr. Patrick lying?

"A. Mr. Patrick was lying in the grassy part between the fence and the lane. Head against the line fence.

"Q. Now, Jack what next did you observe?

"A. Mr. Patrick rolled slightly and reached for his pistol on his right hip. Then Mr. Baldridge commanded him to leave his pistol alone. As near as I can recall, he commanded 'leave it alone, Pat.'

"Q. He put the gun then on Patrick?

"A. That's right.

"Q. Was Mr. Patrick ever able to get his gun from his hip pocket?

"A. No, he got the flap unfastened but was never able to get his gun out.

"Q. Then what happened?

"A. Mr. Baldridge kept backing away.

"Q. Was the gun still on Mr. Patrick?

"A. As I recall, yes.

"Q. Then what happened?

"A. The hunters were to the car and I picked Mr. Patrick up.

"Q. Will ask you Jack what happened to the gun on Mr. Baldridge?

"A. He still had it when he was backing up the road.

"Q. What about the gun on Mr. Patrick?

"A. It was still on him."

The prosecution also called as its witness one Richard Craig who approached the defendant after the officers' car had left the scene. He testified in part as follows:

"Q. Did you see George Baldridge?

"A. I talked to him.

"Q. What was the first thing you said to him?

"A. I asked him 'was that the game warden's car?'

"Q. What did he say?

"A. Yes, 'the sons-of-bitches.'

"Q. What did you say then?

"A. I said 'Why.'

"Q. What did he say?

"A. Well, I will repeat that—I said 'why, what happened?' He said 'I just shot one.' "

The record reveals further that Officer Patrick was dead upon arrival at the hospital a short time after the shooting, death having resulted from the loss of blood. The evidence discloses that the wound was in the hip. The course of the shot was traced and it appeared that the gun was in a position parallel with the ground at the time of its discharge.

The defendant offered evidence tending to establish that the shooting was accidental, that the safety in the defendant's gun was not operating properly and that the gun was accidentally discharged when Officer Patrick got out of his car and attempted to take the gun from the defendant by means of force.

The jury were the sole judges of the credibility of the witnesses and if it placed credence in the testimony offered by the prosecution it can not be said that the court erred in failing to direct a verdict for the defendant or that the judgment is not sustained by sufficient evidence.

The remaining errors assigned may be epitomized as follows:

1. The court erred in refusing to permit the foreman of the jury to make a statement after the verdict had been returned and a poll of the jury waived.

2. The court erred in the admission of evidence.

3. The court erred in refusing to give special charges before argument or to include the same in its general charge.

4. The court erred in its general charge.

As to assignment of error No. 1, supra, the record reveals that after the jury had returned its verdict and the defendant had waived the polling of the jury, the court made a few remarks of appreciation to the jury for its services and counsel for the prosecution also made somewhat similar remarks. The court then asked counsel for the defendant if they desired to make a statement. This they declined to do. The foreman of the jury then arose and asked if he might be permitted to make a statement. This permission was declined which appellant contends was prejudicial error. We cannot concur in such a conclusion as the jury had terminated its duties when it had returned its verdict and announced the same. There is nothing in the record to indicate any misconduct on the part of the jury which would warrant a new trial under §2945.79 R. C. We therefore find no prejudicial error in this assignment.

We have examined the record with reference to alleged errors in the admission of certain exhibits, consisting of photographs of the wounds on the deceased and also of the lane where the shooting occurred. We find that they were properly identified and the court made no prejudicial error in admitting them into the record.

It is also urged that the court erred in permitting the state to ask the defendant on cross-examination whether or not he had ever been convicted of a crime. The objection was overruled and the defendant then testified that he had been convicted of the offense of discharging firearms and that a man by the name of Alexander was involved. He also testified under objection as to the penalty which he received for the offense. We are of the opinion that the court properly overruled defendant's objection for the reason that §2945.42 R. C., provides that a prior conviction may be shown for the purpose of affecting the credibility of a witness. This section provides in part:

"No person is disqualified as a witness in a criminal prosecution * * * by reason of his conviction of crime. * * * Such interest, conviction, or relationship may be shown for the purpose of affecting the credibility of such witness * * *."

See also §2945.59 R. C. The question presented here appears to have been passed upon in State v. Carter, 75 Oh Ap 545, paragraph 2 of the syllabus:

"It is error to sustain the state's objection to a question, propounded to one of the state's witnesses on cross-examination, as to whether such witness has ever been convicted of a felony 'or anything else,' the provisions of §13444-2 GC, permitting the showing, for the purpose of affecting the credibility of the witness, that he has been convicted of 'crime' and such word comprehending misdemeanors under state laws as well as felonies."

See also Harper v. State, 106 Oh St 481; Hanoff v. State. 37 Oh St 178; State v. Hollos, 76 Oh Ap 521; Maranda v. State, 17 Oh Ap 479.

Counsel for the appellant relies upon the case of Kornreich v. Industrial Fire Insurance Co., 132 Oh St 78. We are unable to agree with counsel's conclusion on the law pronounced in this case, for it appears that the judgment of the trial court was reversed by the Supreme Court

for refusing to permit the witness to be cross-examined as to his conviction of guilt of a crime, specifically citing §13442-2 GC (now §2945.42 R. C.), and applied it to the case then at hand. We also find that none of the other alleged errors in the cross-examination of the defendant are well taken.

It is next urged that the court erred in failing to give defendant's special charges 1, 2 and 3 before argument or to include the same in the court's general charge. A trial court is not required to give special instructions to the jury before argument in criminal cases. **State v. Petro, 148 Oh St 473.** However, if such special instructions are correct and not given before argument, they must be given in substance in the general charge. **State v. Williams, 85 Oh Ap 236.** We have examined these special charges, and are of the opinion that the court included the legal principles contained in them in its general charge in so far as applicable to the facts at issue.

We have examined the entire general charge and find no prejudicial error contained therein. If there were any other omissions in the charge it was the duty of counsel to call the court's attention to this fact at the conclusion of the same and request further instruction, which was not done. **State v. Tudor, 154 Oh St 249.**

We find none of the errors assigned well made, and the judgment will be affirmed.

HORNBECK and WISEMAN, JJ, concur.