## COMMONWEALTH vs. JAMES A. FORD.

Plymouth. May 9, 1985. — August 13, 1985.

Present: GREANEY, C.J., KAPLAN, & BROWN, JJ.

*Evidence,* Credibility of witness, Prior conviction. *Jury and Jurors. Practice, Criminal,* Duplicitous convictions.

On an appeal from criminal convictions, this court did not reach the issue whether the trial judge should have allowed the defendant's attorney an opportunity for further questioning of a prosecution witness on cross-examination, where the particular purpose for such further interrogation was not put to the trial judge but was raised for the first time on this appeal. [577-578]

A criminal defendant was not prejudiced by the trial judge's error, upon the admission of certified records of the defendant's prior convictions, in overruling the defendant's objections to the admission of certain extraneous entries, including docket entries showing defaults, warrants issued, and probation violations, where the prosecution did not lay undue stress on the convictions and did not mention the various entries, and where the judge charged the jury correctly on the limited purpose for which the convictions could be received. [578-579]

At the trial of a criminal case, reversible error was not created by the judge's failure, after charging the jury and allowing them to separate for lunch, to fix a definite time for them to reconvene and to specify that they must reconvene in the courtroom in accordance with Mass.R.Crim.P. 20 (e) (2), where the defendant's attorney did not object and no attempt was made to show that the jury's deliberations were infected in any way. [579]

A criminal defendant's convictions of breaking and entering in the nighttime with intent to commit a felony, larceny in a building, and malicious destruction of property of a value exceeding $100, although arising from a single incident, were not duplicitous. [580]

COMPLAINT received and sworn to in the Hingham Division of the District Court Department on February 27, 1984.

On appeal to the jury session the case was tried before *Charles E. Black,* J.

*Brownlow M. Speer*, Committee for Public Counsel Services, for the defendant.

*John P. Corbett*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. A jury of six in Hingham District Court found the defendant guilty of breaking and entering in the nighttime with intent to commit a felony (G. L. c. 266 § 16), larceny in a building (§ 20), and malicious destruction of property of a value exceeding $100 (§ 127), and from the judgments of conviction, upon which consecutive sentences were imposed, the defendant appeals. We affirm the judgments, as well as an order declining to strike the two latter judgments as being, in effect, comprehended within the first.

Responding in the early morning of February 22, 1984, to an alarm from the Radio Shack at South Hingham Plaza, Detective Joel McGinnis and other officers found that the store had been burglarized: the glass entrance door had been bashed in, a glass display case worth $400 broken, and (according to the store manager, called to the scene) nine items worth $8,000 — two television sets and seven pieces of electronic equipment — carried off. About 7:30 that morning, McGinnis, accompanied by Detective John Kichler of the same police unit, went to the Easton police station and met John Ford, the defendant's brother. John Ford admitted complicity in the Hingham break. Upon evidence gathered in the course of the day, a warrant was obtained to search the house of one Menassian, in Saugus. A large amount of merchandise was recovered there, including perhaps five of the items taken from the Radio Shack.

On April 10, 1984, Detective Kichler arrested the defendant upon warrant at the Boston Municipal Court, and, with Officer Larry Schofield, took him to the Hingham police station. He was led into the detectives' room and presently confronted McGinnis and Kichler. Electronic equipment, including material taken from the Radio Shack, was stacked on the floor. Given his rights, the defendant first denied any knowledge of the break, but after McGinnis asked whether he recognized the loot from the Radio Shack, and went on to mention the brother John Ford and the Menassians, the defendant admitted

that he, his brother John, Vinnie Ruggerio, and Julio Caban had done the job; they had taken the stuff from the case, and "screwed out in the car." They "always" wore gloves (no fingerprints had been found). The defendant added that the articles taken from Menassian were worth $90,000, and that Menassian had put out a "contract" for him and the other three. Then there was talk about "protection" for the defendant and the prospect of bail or release on personal recognizance upon arraignment. When the defendant was arraigned the following day, several officers were there, apparently for "protection".

The foregoing is a summary of the Commonwealth's case as testified to by McGinnis, Kichler, and the store manager. Testifying on his own behalf, the defendant denied he had made any confession on April 10: the implication was that the detectives were lying in order to get a conviction in this, for them, "big" case. On cross-examination, however, the defendant conceded that he had lied in claiming that he did not know Ruggerio or Caban.[1] He also conceded that on the night of February 23, 1984, he was in a car with these two and his brother. Further, the defendant was impeached by certified records of his numerous convictions of crime, including convictions for possession of stolen motor vehicles, operating under the influence of intoxicating liquor, operating to endanger, operating after license revocation, possession of burglarious implements, and receiving stolen property.

The defense does not dispute that the evidence as recited was ample to support the verdicts. It argues other points.

1. On cross-examination of Detective Kichler, the defense brought out that his superior had ordered him to conduct the defendant from the Boston Municipal Court to the Hingham police station. Kichler, however, in order to "motivate" the defendant, took a short detour to pass the Radio Shack at South Hingham Plaza and ask the defendant whether he recognized the area. Apparently the defendant said he did because his mother frequented "Building 19" there. The Commonwealth's

---

[1] He tried to take the middle ground that he knew the two men for only two minutes upon their being introduced to him by brother John.

objection was sustained to the question whether Kichler gave the defendant his rights at that time, because, said the judge, "[t]here is no issue in this case of rights," that is, there was no claim that the defendant made any incriminating statement during this period. For the first time, on this appeal, the defense argues that the question should have been allowed in order to show that proper procedure might call for giving the defendant his rights, perhaps upon commencing the detour,[2] or before asking questions during that interval, and that the failure to do so might reflect on Kichler's credibility. This supposed purpose, such as it might be, for further interrogation of Kichler was not put to the trial judge, and may not be made the basis of argument here.[3] We add that the argument, if the defense were in a position to offer it, would put a great strain on *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980) (admissibility of Commonwealth's failure to perform scientific tests or produce other evidence); see the discussion of the rationale of that and similar cases in *Commonwealth* v. *Flanagan, ante* 472, 475-477 (1985).

2. The certified records of the defendant's prior convictions, admitted upon his cross-examination, included docket entries which showed defaults, warrants issued, arrest on warrant, and violation of probation. Although the statute on impeachment by prior conviction, G. L. c. 233, § 21, is itself less than clear on the point, where certified records are used[4] they should hew to the convictions, and extraneous entries should not pass to the jury as part of the exhibits. See *Lamoureux* v. *New York, N.H. & H.R.R.*, 169 Mass. 338, 340 (1897)

---

[2] Cf. *Rhode Island* v. *Innis*, 446 U.S. 291, 302 (1980) (mention of "functional equivalent" of questioning).

[3] The defense did urge on the jury that Kichler's disobedience (as it called it) of his superior's order in making the detour should count against his credibility.

[4] The problem could be readily avoided by proving the convictions through admissions by the defendant in response to the prosecutor's questions without offering the certified papers; or by securing certifications of records properly abbreviated.

(Holmes, J.); *Commonwealth* v. *Callahan*, 358 Mass. 808 (1970); *Commonwealth* v. *Dean*, 6 Mass. App. Ct. 781, 783 (1979). The judge committed error in overruling the defendant's objections to the superfluities. The error is not erased by the fact that the defendant had a string of convictions and the defense itself could rightly characterize him as a "tough guy." Yet we think a normal, worldly-wise jury would accept that a person with a long record might also slip from grace in such matters as turning up in court; that is, one can say, beyond a reasonable doubt, that such damage to the defendant's credibility as was done by proof of the convictions proper, was not materially aggravated by the entries on the certified records. See *United States* v. *Plante*, 472 F.2d 829, 833 (1st Cir.), cert. denied, 411 U.S. 950 (1973). Indeed, the defendant freely referred in his own testimony to his current defaults. The prosecution did not lay undue stress on the convictions and did not mention the various entries; and the judge charged correctly on the limited purpose for which the convictions could be received.

3. The judge, after charging the jury, in effect allowed them to separate and take lunch. He did not fix a definite time for them to reconvene and did not specify that they must reconvene in the courtroom. Thus he was not faithful to Mass.R.Crim.P. 20(e) (2), 378 Mass. 892 (1979).[5] The jurors themselves fixed 1:30 P.M. for reconvening and it may be that they assembled in the juryroom. The defense did not register any objection and there is no attempt to show that the jury's deliberations were infected in any way. Surely the rule should be followed, but it would be mere indulgence to overturn the verdicts for an innocent and inconsequential mistake. See *United States* v. *DiFronzo*, 345 F.2d 383, 385 & n.1 (7th Cir.), cert. denied, 382 U.S. 829 (1965); *United States* v. *Banks*, 485 F.2d 545,

---

[5] Rule 20: "*Trial Jurors . . .* (e) Regulation and Separation of Jurors . . . (2) After Submission of the Cause. Unless the jurors have been sequestered for the duration of the trial, the judge after the final submission of the case, may order that the jurors be permitted to separate for a definite time to be fixed by the judge and then reconvene in the courtroom before retiring for consideration of their verdict."

549 (5th Cir. 1973), cert. denied, 416 U.S. 987 (1974); *State* v. *Williams*, 39 Ohio St. 2d 20, 20-21, 26 (1974).

4. There was no such overlap or congruence among the three crimes of which the defendant was convicted as might call for cancelling any one of them as redundant or duplicative in the sense of *Kuklis* v. *Commonwealth*, 361 Mass. 302, 306-307 (1972). Cf. *Commonwealth* v. *Jones*, 382 Mass. 387, 392-395 (1981). The defense refers to *Commonwealth* v. *Hope*, 22 Pick. 1, 5-6 (1839), as suggesting that the larceny charge overlaps breaking and entering in the nighttime with intent to commit a felony. However, the case of *Josslyn* v. *Commonwealth*, 6 Met. 236, 239-240 (1843), indicates that if those crimes, although arising from a single incident, were charged in separate counts, rather than merged in a single count, the old law would consider them distinct, and would uphold convictions on each. The present law reaches the same result with less attention to formalities of pleading.

The judgments and the order denying the postjudgment motion will be affirmed.

*So ordered.*