COMMONWEALTH vs. ROBERT N. CLARK.

Hampshire.    October 9, 1986. — January 13, 1987.

Present: GREANEY, C.J., PERRETTA, & SMITH, JJ.

*Evidence*, Reputation, Prior conviction, Criminal records. *Practice, Criminal*, Failure to make objection. *Error*, Harmless.

At the trial of a criminal case, it was improper for the prosecutor to introduce evidence of the complainant's character for truthfulness, inasmuch as neither vigorous cross-examination of the complainant nor some evidence in the form of prior inconsistent statements offered to contradict her testimony amounted to an attack on her character for truthfulness. [378-380]

At the trial of a criminal case, in which the defendant was impeached by three certified copies of prior convictions which contained extraneous material prejudicial to the defendant, it was error for the copies to be admitted in evidence as exhibits and to make them available to the jury during deliberations. [380-381]

At the trial of a criminal case improper introduction of evidence of the complainant's character for truthfulness, as well as the admission of certified copies of the defendant's convictions containing extraneous material showing that the defendant had been charged with other crimes and was the subject of defaults and violations of probation proceedings, created a substantial risk of a miscarriage of justice requiring reversal, where the decisive issue in the case was the credibility of the complainant and that of the defendant, and where the evidence against the defendant was not overwhelming. [381-382]

INDICTMENTS found and returned in the Superior Court Department on January 16, 1985.

The cases were tried before *John F. Moriarty*, J.

*David P. Hoose* for the defendant.

*Charles K. Stephenson*, Assistant District Attorney, for the Commonwealth.

SMITH, J. The defendant was the subject of two indictments: one charged him with indecent assault and battery on a person over fourteen years of age (G. L. c. 265, § 13H); the other charged him with breaking and entering a dwelling in the nighttime and committing an assault therein (G. L. c. 266, § 14).

After trial in the Superior Court, the jury returned a verdict of guilty on the indecent assault and battery indictment. The defendant was also found guilty of the lesser included offense of breaking and entering in the nighttime on the other indictment. The defendant contends, on appeal, that the admission of certain evidence was prejudicial error. He also claims that he was denied the effective assistance of counsel.

At trial, the complainant testified that she was twenty-one years old and a student at the University of Massachusetts. In October, 1984, she lived with her roommate in a one-bedroom apartment in the University Park complex in Amherst. On October 7, 1984, a Sunday, at approximately 6:00 P.M., she went to an apartment in a neighboring building in the same complex to ask some friends if they would join her and her roommate for the evening. When no one answered her knock, she went to the adjoining apartment to ask if anyone had seen her friends. The defendant answered the door and the complainant spoke with him briefly. She told the defendant that she lived in an adjacent building and, at his request, signed — with both her name and address — his petition to alter the Massachusetts State seal. When the defendant asked her if they could get together that evening, the complainant responded that she already had plans but would see him some other time. She stayed at the defendant's apartment no more than fifteen minutes.

The complainant returned to her apartment and went out to dinner in Amherst. After dinner, she and her friends went to a local college bar, where she had three or four beers. From there, she and her friends went to a party in another friend's apartment, where she talked, danced, and had two drinks. She left the party between 2:00 A.M. and 3:00 A.M. and went straight home to her apartment. When she arrived home she undressed, put on a T-shirt, and got into bed. She got up and unlocked the door to her apartment because her roommate had earlier that week lost her key. She then went to sleep.

The complainant testified that she awoke to discover the defendant, completely naked, in her bed, with his body pressed against her back. She stated that she then sat up, pulled up the

covers, pushed herself into a corner, and told the defendant to leave. At that point, the complainant's roommate returned to the apartment. She yelled at the defendant to get dressed and leave and he eventually complied.

The complainant's roommate testified that, when she returned to the apartment at approximately 2:30 A.M., she immediately heard the complainant crying and alternately yelling and whimpering. The complainant called out to her, and, when the roommate entered the bedroom, she saw the complainant huddled in the corner of her bed and the defendant lying on the bed, naked. The roommate repeatedly told the defendant to leave. He eventually did so, saying, "See you girls tomorrow."

The complainant did not call the police after the defendant left or the next day. Two days later she told a person with whom she worked (Kathleen Kelly) about the incident.[1]

The defendant's testimony concerning the events that occurred was quite different from the complainant's. He testified that during the evening of October 7 the complainant came to his door twice. On the first occasion, after she had asked about the whereabouts of her friends who lived next door, she inquired whether the defendant could help her get some cocaine. The defendant stated that he could not. He offered her a beer, but she declined. After further conversation, the complainant left.

A couple of hours later, the complainant again came to the defendant's apartment. She again asked him for some cocaine. The defendant repeated that he could not help her and once again offered her a beer, and this time she accepted. She then told the defendant that she and her friends were going to a college bar and that he was welcome to join them if he wished. The defendant replied that he might stop by later and the complainant once again left.

Later on, the defendant went to the bar looking for the complainant. He stayed long enough for a couple of drinks

---

[1] The transcript indicates the complainant did not discuss the incident with her roommate immediately after it happened. During the roommate's testimony she was never asked by the Commonwealth whether the complainant made a "fresh complaint" to her.

but did not see her there. At about 12:30 A.M. he left the bar and went back to the apartment complex with the intention of finding the complainant and her friends. As he approached the complainant's apartment building, he could see lights on in her apartment.

The defendant knocked on the door and, hearing a response, entered. He did not see anyone, so he called out to announce himself. The complainant responded and invited him into the bedroom where she was. After a very brief conversation, the complainant, according to the defendant, began to tug at his sweatpants in the groin area. He undressed and joined her in bed, they kissed and hugged for about five minutes. After about five minutes, the complainant's attitude changed, and she told the defendant to leave. Immediately thereafter, according to the defendant, the roommate entered the room, and she yelled at the defendant to leave. After some discussion, the defendant got dressed and left.

As can be readily seen, the testimony of the complainant and that of the defendant differed in regard to the manner in which the defendant obtained entrance to her room and the events that followed, prior to the arrival of the complainant's roommate. Thus, the jury was presented with a classic "duel of credibility." *Commonwealth* v. *Ferreira*, 373 Mass. 116, 127 (1977). The defendant argues that, as the result of the erroneous introduction of certain evidence, the complainant's credibility was bolstered and his credibility diminished. We discuss the defendant's claim in some detail below.

1. *Evidence of the complainant's character for truthfulness.* The defendant contends that the Commonwealth improperly introduced in evidence the complainant's character for truthfulness. Kathleen Kelly was called by the Commonwealth as its third witness. She identified herself as a probation officer for the District Court of Northampton and stated that the complainant had worked with her from September to December of 1984 as a student intern. She testified as to the fresh complaint made to her by the complainant a few days after the incident occurred. She was then asked by the prosecutor whether she had any knowledge of the complainant's reputation for truth and vera-

city. After an exchange of questions and answers on the subject, Kelly responded that the complainant had a reputation for being a "very trustworthy person."[2] Although the answer was technically not responsive to the question, it nonetheless introduced evidence of the complainant's character for truthfulness. Defense counsel did not object to the admission of this evidence.

The defendant argues that the evidence was inadmissible because the complainant's character for truthfulness was not attacked. See *Commonwealth* v. *Sheline*, 391 Mass. 279, 288 (1984), where the court stated that " [e]vidence of a witness's good character for truthfulness cannot be introduced unless his *character* for truthfulness has been attacked" (emphasis added). The Commonwealth, in its brief, agrees with the defendant that an error occurred but argues that the error was harmless. While the Commonwealth's admission of error is commendable, it does not relieve us of our appellate function of determining whether error was committed. *Commonwealth* v. *Williams*, 19 Mass. App. Ct. 915, 916 (1984).

---

[2] The questioning of the witness and her answers on the subject are as follows:

Q. "Now, during the course of your knowing [the complainant] as an intern, did you have an opportunity to learn her reputation in the community for truth and veracity?"
A. "Yes, I did. [The complainant], in the course of her internship with me —."
Q. "If I may stop you there. Do you know that reputation?"
A. "Yes, I do."
Q. "And how do you know that reputation?"
A. "Through comments of her responsibility that were given me from a number of professionals that I work with regarding her ability with matters of confidentiality regarding juvenile cases."
Q. "And approximately how many people did you speak to regarding [the complainant's] responsibility?"
A. "It seems like every professional person that came in contact with her responded that way. Ten, twelve persons, easily."
Q. "Did you speak with any who knows [the complainant] from the University?"
A. "Yes, I did. At the end of her term as my intern, I met with her supervisor from the University who expressed her deep respect for [her] as a student."
Q. "And after speaking to those people you mentioned, what did you learn of [the complainant's] reputation for truth and veracity?"
A. "That she was a very trustworthy person."

In fulfilling our function we have examined the transcript of the evidence. The complainant was the subject of a vigorous cross-examination. Some evidence in the form of prior inconsistent statements was offered to contradict the testimony of the complainant. However, neither the cross-examination nor the prior inconsistent statements constituted an attack on the complainant's character for truthfulness. See *Commonwealth* v. *Sheline, supra.* Therefore, it was improper for the prosecutor to introduce evidence of her character for truthfulness.

2. *The extraneous matter on the copies of the criminal convictions.* During the course of his testimony, the defendant was impeached by three prior convictions. The convictions were for the crimes of (1) uttering a false prescription, (2) uttering a forged instrument, and (3) distribution of cocaine, committed at different times. The prosecutor asked the defendant if he was the person named in each of the certified copies of convictions. The defendant responded affirmatively on each occasion. At the end of the defendant's testimony, the certified copies were offered in evidence as exhibits. They were in the possession of the jury during its deliberations. The defendant argues that, because the exhibits contained materials extraneous to the convictions, he was denied a fair trial.

The copies of convictions contained a host of extraneous material. The "uttering a forged prescription" conviction exhibit contained, among other things, a notation that a capias had to be issued for the arrest of the defendant. The "uttering a forged instrument" exhibit contained a complaint, a recognizance form, a document entitled "record of arrest," a "determination of indigent defendant's need of counsel" form, an attorney's appearance form, and what appears to be a subpoena form. The recognizance form indicated that the defendant was charged with other crimes, specifically, forgery and receiving stolen property. Both the subpoena and need of counsel forms also indicated that the defendant had previously been charged with receiving stolen property.

The "distribution of cocaine" exhibit went to the jury with the indictment, attorney's appearance and docket entries, not only from the initial action, but also from a violation of pro-

bation. The docket entries were also replete with references to defaults, warrants, and violations of probation.

In *Commonwealth* v. *Ford*, 397 Mass. 298 (1986), decided some eleven months *after* the trial of this case, the court held that, in the circumstances of that case, the use of certified copies of records of the defendant's prior convictions containing extraneous matter deprived him of a fair trial. In the present case, as in *Ford*, the certified records of the defendant's prior convictions included docket entries which showed defaults, warrants issued, and violations of probation. As in *Ford*, the admission of such unexpurgated records as exhibits in this case was error.[3]

3. *Substantial risk of miscarriage of justice*. Defense counsel did not object to the introduction of the evidence described in parts 1 and 2 of this opinion and we examine each error to see if it was of "a type and seriousness which should lead [the court] to reverse in the absence of a proper [objection]. The test is whether there is a substantial risk of a miscarriage of justice." *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

The decisive issue in this case was the credibility of the complainant and of the defendant. It is the jury's function, not ours, to determine the credibility of the witnesses. *Commonwealth* v. *Ford, supra* at 301-302. However, we believe that each error may have directly affected the jury's evaluation of that issue. The testimony of a person associated with the court system that the complainant was a "very trustworthy person" could have the effect of enhancing the complainant's credibility. The extraneous material on the certified copies of convictions

---

[3] Although *Commonwealth* v. *Ford, supra*, was not decided until after the trial of this case, the Commonwealth properly does not raise any question as to its retroactivity. The *Ford* decision did not enunciate a new rule that would require us to decide "whether it will be applied only prospectively." *Commonwealth* v. *Ennis*, 398 Mass. 170, 173 (1986), quoting from *Commonwealth* v. *Breese*, 389 Mass. 540, 541 (1983). The decision merely articulated existing law. See *Commonwealth* v. *Dean*, 6 Mass. App. Ct. 781, 783 (1979) ("[t]he judge allowed the prosecutor to ask the defendant only about his conviction and sentence and did not permit him to offer the records in evidence because one of them set forth a violation of probation").

made available to the jury showed that the defendant had been charged with other crimes and was the subject of defaults and violations of probation proceedings. "It may be that the record of prior convictions so undermined the defendant's credibility that the extraneous entries were superfluous to the Commonwealth's successful attempt to impeach." *Commonwealth* v. *Ford, supra* at 301. Or, it may be that the records of defaults, warrants, arrests, and probation violations went beyond the fact of prior conviction to "portray[   ] the defendant as someone who had made a career of beating the system," as the defendant argues.

The evidence against the defendant was not overwhelming. The complainant's testimony as to the manner in which the defendant entered her room and his subsequent conduct, prior to the arrival of her roommate, was corroborated only by her fresh complaint made to a coworker some two to three days after the incident. This case is not like *Commonwealth* v. *Grammo*, 8 Mass. App. Ct. 447, 456 (1979). In *Grammo*, the trial judge erroneously admitted evidence that bolstered the credibility of a witness. The court held that the evidence was harmless in view of other compelling evidence of guilt. Contrast *Commonwealth* v. *Ford, supra* at 302 ("[b]ecause . . . there was no evidence of the defendant's involvement apart from the disputed confession, we cannot say 'with fair assurance' that the improperly admitted evidence did not have a significant impact on the jury's decision"). We hold that in the circumstances of this case each error by itself, and also their combined effect, created a substantial risk of a miscarriage of justice.

We emphasize that we are not reversing the judgment entered in this case because of any errors committed by the trial judge. Rather, the errors of the prosecutor and defense counsel have caused us to order a new trial.[4] We believe it would have been better practice on the part of the prosecutor to discuss with defense counsel and with the judge beforehand the admissibility

---

[4] Appellate counsel for the Commonwealth and for the defendant were not trial counsel.

of the character evidence. However, once the prosecutor started to get into the area of character evidence, defense counsel should have promptly objected, thus invoking the judge's ruling on the matter.

It takes no hindsight on our part to note that both the prosecutor and defense counsel were wrong in not examining the certified copies of convictions before they were introduced as exhibits. It should not be necessary for us to state the obvious — it is the function of trial attorneys, *not the trial judge*, to examine materials before they are admitted as exhibits to make sure that they do not contain prejudicial matter.

4. *Other issues*. The defendant claims that he received ineffective assistance of counsel. Because we reverse on other grounds, we do not consider that contention.

Only two of the other issues may resurface at a new trial. It was not an abuse of discretion for the judge here to admit the defendant's prior convictions, although a judge at retrial may exercise his independent discretion on the matter. At a new trial, the complainant's handwritten statement of the events should not be admitted if it is used only to refresh her recollection.

*Judgments reversed.*

*Verdicts set aside.*